[Civ. No. 31231.    Second Dist., Div. Three.    May 14, 1968.]

MARGUERITE SHAKESPEARE et al., Plaintiffs and Appellants, v. SIMON ZERVOS, Defendant and Respondent.

(Consolidated Actions.)

Marguerite Shakespeare and Gene Shakespeare, in pro. per., for Plaintiffs and Appellants.

Simon Zervos, in pro. per., for Defendant and Respondent.

SHINN, J.*—Appeals by Marguerite Shakespeare and Gene Shakespeare, a son of Marguerite, from a judgment in

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

three actions that were consolidated for trial. In one action (No. 1652) Mrs. Shakespeare sued Simon Zervos for damages for false arrest and malicious prosecution. In a separate action (No. 1653) Gene Shakespeare sued Zervos for false arrest. He had previously sued Zervos in action No. 1049 for false arrest and malicious prosecution; there was a final judgment in favor of the defendant in that action upon the cause of action for malicious prosecution but a new trial had been granted on the cause of action for false arrest, and the action was still pending. The three actions arose out of a single arrest of Marguerite and a single arrest of Gene May 4, 1962, by Zervos, both without a warrant. The arrests were made for violation of subdivision (j) of section 602 of the Penal Code (trespass).[1]

The cases were consolidated and tried together before the court, findings and conclusions were made, the arrests were determined to have been lawful, the prosecution of Mrs. Shakespeare without malice, and a consolidated judgment was entered in favor of the defendant. Each plaintiff appealed.

The case was tried without the assistance of counsel on either side. The record on appeal consists of a reporter's transcript of 702 pages, a settled statement of 144 pages[2] and numerous exhibits. There is no clerk's transcript. The plaintiffs have filed separate briefs in propria persona. The defendant sent a letter to the court which was filed as his brief. It is

---

[1] "(j) Entering any lands, whether unenclosed or enclosed by fence, for the purpose of injuring any property or property rights or with the intention of interfering with, obstructing, or injuring any lawful business or occupation carried on by the owner of such land, his agent or by the person in lawful possession; . . ."

[2] The settled statement contains the following: A notice of appeal, a notice that the appeal would be on a settled statement, plus all court files and exhibits; affidavit of plaintiffs as to delayed entry of the judgment in the register of actions; the complaints and answers in actions 1652 and 1653; motion to disqualify Judge Ellsworth Meyer in action 1049 (in the former trial); affidavit of Gene Shakespeare re motion to disqualify; memorandum of law on the motion with addenda and points and authorities on false arrest; a request for findings in the consolidated actions; a statement of the case and summary of proceedings and evidence; a notice of motion by Mrs. Shakespeare to require Zervos to prove his testimony was not perjurous, with affidavit of Mrs. Shakespeare detailing the allegedly false statements; an unsigned order to show cause on the same; a second affidavit of Mrs. Shakespeare relating to the same matter; points and authorities on the motion re alleged perjury; an affidavit of Mrs. Shakespeare in No. 1652 labeled "Rebuttal of Plaintiff to Defendant's Case"; in No. 1652, a notice of motion to reopen trial with declaration of Mrs. Shakespeare that she was not permitted to put on her case for malicious prosecution; proposed findings, conclusions and judgment in consolidated cases; points and authorities. There is also a trial memorandum submitted prior to the trial on June 11, 1965, of

set out below[3] and will be considered only as an excuse offered by the defendant for his failure to file a brief.

We have reached the conclusion that the determination in favor of the defendant upon the material issues has support in the evidence, and in law, that other claims of error are untenable and that the judgment should be affirmed.

The immediate circumstances of the arrests of plaintiffs were uncomplicated. Zervos owned a residential property fronting on Orange Grove Avenue in Pasadena at the southwest corner of its intersection with Madeline Drive. It was known as the John S. Cravens estate. The grounds were large and well landscaped. The house, a mansion of three stories, with 37 rooms, was set back at the end of a broad driveway that led from Orange Grove Avenue to the front door, a distance of 200 feet or more from the street.

This magnificent structure and estate, an historic monument of former elegance, had recently been acquired by Zervos and was for sale. The house was unoccupied except for the use Zervos made of it as an office in his business of importing products from Greece. There was no evidence that anyone slept in the house or that Zervos employed a watchman to

---

No. 1049 in which Gene Shakespeare stated he ''will not passively permit abridgement of his Constitutional rights under the 4th, 5th, 6th, 7th or 14th amendments, or any other Constitutional provision; nor deprivation of his civil rights whether by conspiracy or under color of law as protected by 42 U.S.C.A. 1981-1986 inclusive, or subject of any other federal enactment.''

[3]''Honorable Judges:

''I am writing this letter because I don't have the funds with which to engage legal counsel, nor do I have the legal training to prepare the required affidavits in opposition to Appellants Appeal on file.

''I hereby state that the entire Appellants Briefs are untrue, sham and frivolous, with the exception of certain abstracts from Reporter's transcript.

''The harassment of Shakespeares' non-meritorious suits against me goes back to the year 1961. As a consequence, I had lost my house, all of my money, and tomorrow, April 17, 1967, I am going bankrupt. Life for me, my wife and our four minor children has become a nightmare during the last six years. As Mrs. Shakespeare told me once, 'I will never let off of you until I die'.

''The pending Appeal No. 31231, stems from my citizen's arrest of Shakespeares on my property, May 4, 1962. Twice this matter has been adjudicated, once by a Jury and once by Hon. Richard Wells. In both of these trials I had prevailed because the Jury and the Court felt that my citizen's arrest of Shasepeares and on the aforementioned date was justifiable and without malice.

''I pray, that Appellants Appeal on file be denied.

''Respectfully yours,
/s/ Simon G. Zervos
Simon G. Zervos''

guard the premises. He relied upon the Pasadena police to respond to any trouble he reported to them.

In the summer of 1961 Mrs. Shakespeare developed an interest in acquiring the property and she continued her efforts through May 4, 1962. She was unwilling to pay the price Zervos was asking and they failed to reach an agreement of sale. During these many months of negotiation in which Mrs. Shakespeare had the assistance of an agent and Zervos was represented by an agent, there was developed between Zervos and the Shakespeares mutual feelings of distrust and violent dislike, until Zervos refused to have anything to do with Mrs. Shakespeare and warned her and her son not to come onto the property except under the penalty of arrest. Such were the attitudes of the parties toward each other at the time of the arrests.

Zervos testified that on November 14, 1961, he found Mrs. Shakespeare on the property; she had turned on all the hydrants and incurred a charge for water of $59 which he paid. He also testified there had been trespasses by many people and numerous burglaries including the loss of several chandeliers. There were huge chandeliers valued at $5,000 which were removed by Zervos for safekeeping.

March 4, 1962, about 4:30 p.m. as Zervos drove up he saw plaintiffs' car parked in the drive in front of the door; he saw the plaintiffs emerge from the front door, Mrs. Shakespeare carrying a bundle of papers under her arm; the doors, which had been locked, had been left open; Zervos entered the house and found that his maps and plans for remodeling the house were missing; he never saw them again. Plaintiffs drove away and Zervos notified the police.

On the evening of April 15, 1962, Zervos found four young people on the premises; a rear window had been broken and the front door had been unlocked from the inside. Zervos arrested the four people and called the police who came and took charge of the arrestees. The two plaintiffs were in the immediate vicinity, knew what was going on and later contacted the arrestees and talked with them about the incident. On the following day Zervos sent a telegram to the plaintiffs warning them that they would be arrested if they came upon the property.

Zervos testified that shortly before he arrested the plaintiffs on May 4, 1962, he saw their car parked about a foot from the front door; he heard the voices of plaintiffs coming from inside the house; he went across the street and called the

police; after he returned both plaintiffs, who had left the property, returned; Zervos arrested Gene Shakespeare; Mrs. Shakespeare said "Why don't you arrest me too," and he arrested her; at this time police officers were present and they took charge of the plaintiffs.

In the trial Zervos contended that the plaintiffs in returning to the property on May 4th invited the arrests but there was no pleading or finding that plaintiffs consented to the arrests.

Mrs. Shakespeare testified that on November 14, 1961, she had only let the water trickle on a Camellia plant; both plaintiffs denied they had ever taken anything from the house.

Mrs. Shakespeare had a foster son named Fayette DeFrenn; she had produced DeFrenn as a prospective purchaser; he had filed a suit against Zervos for specific performance of an alleged contract to sell him the property and on May 4th the suit was still pending. April 23, 1962, in this action the court made an order that DeFrenn might go upon the premises to care for them but that Mrs. Shakespeare should not accompany him. In the trial plaintiffs contended the order gave them authority to enter the premises; the finding of the court in the present action was to the contrary.

The crucial question was whether Zervos had probable cause for the arrests. In the trial that question was not answered by the court upon the evidence of a few isolated incidents. There was much more to be considered. The evidence developed the existence of a long drawn out period of senseless bickering and altercations generated by the persistent efforts of Mrs. Shakespeare to acquire the property. The parties were not only willing to bring to light all the details of this vocal feud but they were determined to do so. As a result there was a prolonged display of accusations, contradictions and disputes throughout the trial which shed light upon the characters of the parties, the propensity of the plaintiffs to make trouble for Zervos and the fears and motives of the latter in protecting his property from the actual and threatened interferences of the plaintiffs.

Seldom, if ever, have we seen a record of a trial in which the litigants, ignorant of the first principle of court procedure, obstinately and officiously took control of the trial from the judge and persisted in conducting it as they pleased.

The reproving voice of the judge in his endeavor to keep the trial within bounds was powerless to curb the loquacious accusations and arguments of the Shakespeares or quiet the

atmosphere of the trial which was kept in a state of agitation by the equally disturbing recriminations of Zervos.

The trial was commenced on June 15, 1965 and ended June 22, 1965. Plaintiffs testified and introduced the testimony of four other witnesses; Zervos testified and introduced the testimony of one other witness. Not one of these additional witnesses had any knowledge of the particular occurrences testified to by Zervos as his reasons for the arrests of plaintiffs. The only witnesses to the arrests were Zervos, the plaintiffs and the officers, who did not testify in the trial.

Under proper procedure all the evidence relevant to the lawfulness of the arrests could have been received in a single day and could have been contained in not to exceed 75 pages of reporter's transcript.

The parties were unable to comprehend the issues to be tried and ignored the repeated efforts of the court to keep the trial within them. They had been carrying on a quarrel over the property for nearly a year and were unwilling to end it.

At the time of the trial of the present action the DeFrenn action had been tried and decided in favor of Zervos. The cause of action had been assigned to Mrs. Shakespeare and she had taken an appeal. The trial of the present action degenerated into a retrial of the DeFrenn action and a running account of the conduct of the parties in connection with the efforts of Mrs. Shakespeare and her sons to acquire the property. Repeatedly the court stated they could not retry the DeFrenn case and the merits of the long and bitter controversy which led up to it, but the court's admonitions, requests and directions were answered with contradictions, arguments and speeches in an unquenchable flow of words and a bland disregard of the court's authority. At no time did the court interfere in the slightest with the development of evidence relative to the causes of action on trial.

The record will disclose in convincing manner that the purposes, conduct and the general activities of the Shakespeares were not characterized by a conspicuous meekness or desire to avoid controversy. In addition to an almost day by day account of the actions of the plaintiffs over a period of about a year before the arrests, the trial strayed into more remote fields. Evidence was received of actions brought by the plaintiffs against a half dozen judges, the police and many others for damages, upon claims arising out of the arrests and prosecution of plaintiffs. There was evidence of an article

published in the *Los Angeles Times* which was the basis of actions for damages brought by plaintiffs against the Times Mirror Company and the wife of one of the officers of the *Times*. Mrs. Shakespeare testified there were altogether 10 suits filed by plaintiffs, stemming from the arrests. There was patently inadmissible evidence of the actions of judges in DeFrenn's suit and criticism of the same, and all through the trial constant argument and disrespectful disagreement with the court's rulings.

Returning to the case in hand we find about 600 pages of testimony descriptive of an inexplicable quarrel over the property of Zervos. There was ample evidence that the controversy was initiated and kept alive by Mrs. Shakespeare, that her activities were affirmative and aggressive while the conduct of Zervos clearly indicated he was on the defensive and anxious to escape from the conflict. He was harassed by the frequent intrusions and depredations upon his property and suspicious and fearful of the Shakespeares. There was no evidence whatever that he had any motive or desire except to protect his property until he could sell it.

The court found that at the time of the arrests plaintiffs were committing a violation of subdivision (j) of section 602 of the Penal Code. Although the question of guilt was not the issue to be tried (*Coverstone* v. *Davies*, 38 Cal.2d 315 [239 P.2d 876]), this finding, together with the finding that the arrests were lawful amounted to a determination that Zervos had probable cause for the arrests.

The court's determination that Zervos had grounds for a strong and reasonable belief that the plaintiffs were on his property for the purpose of interfering with and injuring his property and property rights was a reasonable deduction from the evidence, and may not be disturbed.

Plaintiffs asked for different findings which would be in their favor on all issues. The present criticism of the findings is only that they were in favor of Zervos.

At the close of the defense Gene Shakespeare and Zervos said they had no more evidence to offer. Mrs. Shakespeare offered in evidence certain police reports that had been previously excluded from evidence, and, upon objection, they were again excluded. Mrs. Shakespeare also asked "Don't we ever have a chance to question Mr. Zervos again?" The court said "All parties now have had an opportunity to submit evidence." Mrs. Shakespeare asked "How about the malicious prosecution, your Honor?" The court replied "You had an

opportunity to submit your evidence. All the evidence is in,'' and Mrs. Shakespeare said ''No, we haven't even started on the malicious prosecution.'' The court said ''It's the ruling of the court that you had an opportunity to submit the evidence on your malicious prosecution case. That was the first thing we did here. . . . The evidence has all been put in at this point'' (on the issue of liability). The cause was then submitted.

Mrs. Shakespeare contends she was not permitted to introduce evidence on her cause of action for malicious prosecution. The record shows that at the commencement of the taking of evidence the court directed that the plaintiffs should introduce their evidence upon their several causes of action and ruled that the answers of Zervos admitted that the arrests were made without a warrant, thus casting upon Zervos the burden of proving they were legal. Explaining where the burden of proof lay, the court directed Mrs. Shakespeare to introduce her evidence upon her cause of action for malicious prosecution. In the lengthy discussions which followed, Mrs. Shakespeare stated she did not believe she had a cause of action for malicious prosecution because ''I think this is a continuing false arrest'' and ''I have the feeling that the malicious prosecution is contingent on the false arrest.'' When it appeared that Mrs. Shakespeare did not intend to offer evidence on her cause of action for malicious prosecution in addition to evidence relating to the arrests, Zervos made a motion for dismissal of the cause of action for malicious prosecution and the court granted the motion. Thereupon Mrs. Shakespeare said she would be prepared to introduce her evidence on the following day. The court vacated its order and told Mrs. Shakespeare she would have an opportunity to present any evidence the following day, and that if she produced none Zervos would be entitled to a judgment. Mrs. Shakespeare said ''Very good, your Honor.'' The court proceeded to receive evidence offered by the defendant. The court had previously stated that any evidence received would apply to all causes of action of the plaintiffs. In arguing against the court's rulings Mrs. Shakespeare said ''This is the first time I have ever had anyone try to tell me to put on a case different than I have intended to do it.''

It is clear from the record that the court and the parties understood that the evidence that was received was applicable to all the causes of action in the consolidated cases. The contention of Mrs. Shakespeare that she was not permitted to

introduce evidence upon her cause of action for malicious prosecution is untenable.

Appellants contend that their acquittal of violation of subdivision (j) of section 602 was res judicata of the question of the legality of the arrests which, of course, is not true. (*Coverstone* v. *Davies, supra*, 38 Cal.2d 315.) Their principal argument is that there was no cause for their arrests. They cite some cases involving claims of trespass but none in which the facts bear even slight resemblance to the facts of the present case. We have never heard of such a one.

It is sufficient to say, without a recapitulation of the evidence, that we find it sufficient to support the determination of the trial court that the arrests of plaintiffs were made upon probable cause and were legal and that the prosecution of Mrs. Shakespeare was in good faith and without malice. There are accusations against the trial judge of fraud, arbitrary action, conspiracy, etc., similar to those asserted in the trial, in sharp contrast with the fair and conscientious demeanor of the judge in a most trying experience. Other arguments asserting error in the trial have been considered and found undeserving of particular discussion.

The cases were fairly tried and justly decided.

The judgment is affirmed.

Cobey, Acting P. J., and Moss, J., concurred.

A petition for a rehearing was denied June 13, 1968, and appellants' petition for a hearing by the Supreme Court was denied July 10, 1968.